UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENNIS BRENNAN,

                Plaintiff,

v.                                                5:09-CV-1015
                                                (GTS/ATB)

THE ROMAN CATHOLIC DIOCESE
OF SYRACUSE NEW YORK, INC.,

                Defendant.
_____

APPEARANCES:                              OF COUNSEL:

SCHLATHER STUMBAR PARKS & SALK, LLP     RAYMOND SCHLATHER, ESQ.
  Counsel for Plaintiff                      DIANE V. BRUNS, ESQ.
200 East Buffalo Street, P.O. Box 353
Ithaca, NY 14851

SEARCY DENNEY SCAROLA                JOHN SCAROLA, ESQ.
BARNHART & SHIPLEY, P.A.
  Co-Counsel for Plaintiff
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409

HANCOCK & ESTABROOK, LLP              PAUL M. HANRAHAN, ESQ.
  Counsel for Defendant                   MAUREEN E. MANEY, ESQ.
1500 AXA Tower I, 100 Madison Street       JANET D. CALLAHAN, ESQ.
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

Currently before the Court, in this breach-of-contract action filed by Dennis Brennan

("Plaintiff") against The Roman Catholic Diocese of Syracuse New York, Inc. ("Defendant"),

are Defendant's motion for summary judgment (Dkt. No. 112), and Plaintiff's motion for leave

to file a Third Amended Complaint (Dkt. No. 115). For the reasons set forth below, Defendant's

motion is granted in part and denied in part, and Plaintiff's motion is denied.

## I.   RELEVANT BACKGROUND

### A.   Procedural History

Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite this action's procedural history, which involves, *inter alia*, the following: (1) a transfer from the Middle District of Florida; (2) the striking of Plaintiff's unauthorized Amended Complaint; (3) the subsequent filing of a motion for leave to file a Second Amended Complaint (which sought to add a new party and five new causes of action against the Diocese); (4) the amendment of that motion so as to seek leave to file a revised Second Amended Complaint (which retains two of the new five causes of action, deletes the remaining three new causes of action, and adds another new cause of action, and withdraws the addition of a new party); (5) the so-ordered stipulation granting Plaintiff leave to file a further-revised Second Amended Complaint; (6) the filing of that Second Amended Complaint under the name "Revised First Amended Complaint"; and (7) the granting of Defendants' motion for judgment on the pleadings, dismissing Plaintiff's Third, Fourth and Fifth Causes of Action in his Second Amended Complaint.  (*See generally* Docket Sheet.)

### B.   Plaintiff's Causes of Action

Surviving the Court's Decision and Order of January 10, 2012, are the following two causes of action asserted in Plaintiff's Second Amended Complaint: (1) a cause of action for a judgment declaring that Plaintiff is entitled to compensation for losses and expenses that he has incurred, and will continue to incur, related to his medical treatment; and (2) a cause of action for breach of contract based on Defendant's refusal to pay for "reasonable and necessary therapeutic psychological expenses" despite the agreement entered into between the parties.

(Dkt. No. 73 [Plf.'s Second Am. Compl.].)  Generally, these causes of action are based on the following factual allegations.

In the 1960s, Plaintiff was raped by Father Thomas Neary, a Roman Catholic priest and employee of Defendant.  (*Id*. at ¶¶ 11, 12.)  In the summer of 2001, Plaintiff remembered that he was raped by Father Neary.  (*Id.*)  In January 2002, Plaintiff spoke with Bishop Thomas Costello, who promised Plaintiff that Defendant would "pay for whatever help Plaintiff felt he needed."  (*Id.* at ¶ 14.)  In April 2002, Defendant began paying for counseling that Plaintiff underwent with Dr. Mary D. Lutzo in St. Petersburg, Florida.  (*Id.* ¶ 15.)  Thereafter, the United States Conference of Catholic Bishops issued the "Charter for Protection of Children and Young People ("Charter") and the "Essential Norms."  (*Id.* at ¶ 17.)  As part of the Charter, each individual diocese in the United States, including Defendant, was mandated to, among other things, "utilize individuals known as 'Victims Assistance Coordinators' and/or 'Diocesan Review Board' to assist all survivors of clergy abuse regardless of their age or when the clerical sexual abuse occurred."  (*Id*. at ¶ 18.)

In response to the Charter, Defendant promulgated the "Policy Relating to Clergy Misconduct with Minors" ("the Policy").  (*Id*. at ¶ 19.)  The Policy put in place a "Diocesan Assistance Coordinator" whose role is to provide "psychological assistance to those alleging abuse" and to act as the "advocate" for survivors of clergy abuse.  (*Id*. at ¶ 20.)  As employees of Defendant, Teresa Secreti and Nuala Collins act as diocesan victim advocates.  (*Id*. at ¶¶ 22, 23.)  Part of the responsibility of the victim advocates includes keeping the Bishop and/or members of the Diocesan Review Board informed of the status of the case the advocate is handling.  (*Id*. at ¶ 25.)

On February 11, 2003, Plaintiff sent a letter to Bishop Costello detailing "the devastating effects that were the result of the rape by Father Neary." (*Id*. at ¶ 28.) In that letter, Plaintiff demanded a monetary settlement. (*Id*.) On February 18, 2003, Dr. Lutzo spoke with Ms. Secreti. (*Id*. at ¶ 29.) During this conversation, Ms. Secreti told Dr. Lutzo that, by making demands in a letter, Plaintiff "put it on a different level–a different arena, a different spot." (*Id*.) Ms. Secreti further stated that, while she did not "want to say we are going to stop counseling[,] . . . we are in a different place now than when we started." (*Id*.)

On March 17, 2003, Ms. Secreti wrote Plaintiff a letter advising him that Defendant had "put into place the office of the Assistance Coordinator that is designed to provide survivors of clerical sexual abuse with pastorial [sic] and therapeutic assistance." (*Id*. at ¶ 30.) In this letter, Ms. Secreti advised Plaintiff that, for Defendant to continue providing financial assistance for therapy, Plaintiff would have to sign a release of information. (*Id*.) Finally, Ms. Secreti stated that Defendant would authorize payment of Plaintiff's counseling through April 15, 2003, to review Dr. Lutzo's records. (*Id*.)

On April 11, 2003, Dr. Lutzo sent Defendant the information that Ms. Secreti had requested regarding Plaintiff. (*Id*. at ¶ 34.) On May 5, 2003, Plaintiff, through an attorney whom he had retained, sent Defendant a demand letter. (*Id*. at 39.) On June 30, 2003, Paul Hanrahan sent Plaintiff's attorney a response stating that, if Plaintiff was contemplating litigation, this would "bear significantly on the [Diocese's] position with respect to continuation of pastoral assistance." (*Id*. at ¶ 40.)[1]

---

[1] Plaintiff took no further action until filing the current action on October 10, 2007. (*Id*. at ¶ 41.)

Between July 9, 2003, and November 30, 2008, Plaintiff received treatment from Dr. Lutzo on a number of occasions. (*Id*. at ¶¶ 45-100.) Plaintiff also received treatment from a psychiatrist, Dr. Walter Griffith, beginning in 2006. (*Id*. at ¶ 63.) In addition, starting on November 14, 2006, Plaintiff was seen on more than one occasion by a clinical psychologist, Dr. Karen Moorhead. (*Id*. at ¶¶ 64, 70.)

In April 2007, after consulting with Ms. Secreti, Dr. Lutzo sent a therapeutic treatment plan (the "Plan") to Defendant. (*Id*. at ¶ 78.) The Plan, which was recommended by all of Plaintiff's health care providers, provided for a minimum six-week residential program for Plaintiff, followed by a minimum of two weeks of day programs. (*Id*.) The total cost of the Plan was $59,497.02. (*Id*.)

In June 2007, Ms. Secreti informed Plaintiff that Defendant "was going to go with Dr. Moorhead's 'original recommendation' of continued out-patient therapy" in lieu of paying for the Plan. (*Id*. at ¶¶ 84, 85.) During the same month, Plaintiff spoke with Marti Zeitz, the Victim Assistance Coordinator for the Diocese of St. Petersburg, who referred Plaintiff to Timothy McGivern, a licensed mental health therapist. (*Id*. at ¶¶ 47, 88.) Plaintiff met with Mr. McGivern and began attending a men's group facilitated by Mr. McGivern. (*Id*. at ¶ 88.) On August 9, 2007, Defendant agreed to pay for counseling from Mr. McGivern. (*Id*. at ¶ 92.)

In June 2008, Defendant stopped paying for all therapeutic and psychological care. (*Id*. at ¶ 94.) On October 27, 2008, Defendant informed Plaintiff that it would reimburse Dr. Lutzo for services through November 30, 2008. (*Id*. at ¶ 100.)

Despite having to undergo repeated correspondence with Ms. Secreti and Bishop Costello regarding reimbursement for therapeutic expenses, Plaintiff was reimbursed for his medical expenses resulting from his treatment for all but $2,478.46 of his out-of-pocket expenses. (*Id*. at ¶ 74.)

Based on these (and other) factual allegations, Plaintiff alleges that he has suffered and continues to suffer great pain of mind and body, shock, emotional distress, severe emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of reputation and loss of enjoyment of life. (*Id.* at ¶¶ 103, 104.) Plaintiff also alleges that he has suffered spiritually, was prevented and will continue to be prevented from performing daily activities, and has sustained and will continue to sustain loss of earnings and earning capacity. (*Id.*)

## II.     PENDING MOTIONS

### A.     Parties' Arguments on Defendant's Motion for Summary Judgment

Generally, in support of its motion for summary judgment, Defendant asserts the following four arguments: (1) to the extent Plaintiff's First Cause of Action (seeking a declaratory judgment) is based on a tort theory of liability, that cause of action is barred by the law-of-the-case doctrine, given that, in its Decision and Order of January 10, 2012, the Court dismissed all of Plaintiff's tort claims; (2) to the extent Plaintiff's First Cause of Action is based on a breach-of-contract theory of liability, the success of that cause of action is premised on the success of Plaintiff's Second Cause of Action (for breach of contract); (3) Plaintiff's Second Cause of Action fails because, based on the current evidence, no rational fact-finder could conclude that valid consideration, sufficient to support the contractual obligation of Defendant, was created by any of the three acts cited by Plaintiff (i.e., [a] his foregoing of any time-barred legal action against Defendant so that financial assistance would continue, [b] his subsequent waiver of privilege protections and disclosure of confidential health information to Defendant, and [c] his relinquishment of control over his treatment to persons or entities other than

Defendant); and (4) in the alternative, Plaintiff's Second Cause of Action fails because, based on

the current record, no rational fact-finder could conclude that there was a meeting of the minds

between the parties with respect to the essential and material terms of the contract (i.e., the

scope, extent and duration of the treatment for which Defendant allegedly contracted to pay) so

as to create an enforceable contract. (Dkt. No. 112, Attach. 14.)[2]

Generally, in response to Defendant's motion for summary judgment, Plaintiff argues the

following four arguments: (1) while the success of Plaintiff's First Cause of Action (seeking a

declaratory judgment) depends on the success of Plaintiff's Second Cause of Action (for breach

of contract), the record evidence currently before the Court clearly satisfies the requirements for

an enforceable contract, under Florida law; (2) a genuine dispute of material fact exists with

regard to Plaintiff's Second Cause of Action because (a) Defendant conceded, in its Response to

Plaintiff's Interrogatory No. 4, that a legally enforceable contract exists between the parties, and

(b) to the extent that concession leaves open any issue as to the scope and extent of Defendant's

obligations to Plaintiff, those issues are resolved by (i) the covenant of good faith and fair

dealing (which Florida law implies as a condition of every contractual relationship, and/or the

(ii) the record evidence establishing the existence of a sufficiently definite obligation on the part

of Defendant; (3) the contention that Defendant is entitled to summary judgment because the

contract alleged by Defendant was not supported by adequate consideration must be rejected

because (a) Defendant has failed to raise the affirmative defense of lack of consideration, (b)

permitting Defendant to raise the affirmative defense for the first time at the summary judgment

---

[2]     Defendant's memorandum of law violates the Court's Local Rules of Practice in that it omits the required table of contents. N.D.N.Y. L.R. 7.1(a)(1). Defense counsel is respectfully reminded to comply with this local rule in the future.

stage would cause undue prejudice to Plaintiff (who has not focused on that issue during discovery, and who sustained the dismissal of his tort claims based on the existence of the breach-of-contract claim), and (c) reopening discovery would not cure this prejudice given that Defendant's witnesses are now alerted to the nature of Plaintiff's claimed consideration; and (4) in any event, the record evidence establishes that Plaintiff gave legally sufficient consideration in exchange for Defendant's promises of healthcare assistance and financing (specifically, consideration in the form of an agreement to forego a claim of even doubtful validity if made in good faith, Plaintiff's disclosure of his confidential healthcare records a year after Defendant starting paying for treatment as a gift, or Plaintiff's decision to incur the expense of treatment by Dr. Mary Lutzo). (Dkt. No. 124.)[3]

Generally, in reply to Plaintiff's response, Defendant asserts the following six arguments: (1) in the first sentence of its Response to Plaintiff's Interrogatory No. 4 (which Plaintiff conveniently omitted from its opposition memorandum of law), Defendant expressly stated that it was in no way conceding the existence of an enforceable contract between the parties; (2) under Florida law, the covenant of "good faith" (which deals with a contract's interpretation and execution, not its creation) will not create a contract that does not otherwise exist; (3) Plaintiff has failed to demonstrate a factual issue with regard to the part of Defendant's motion that seeks dismissal of Plaintiff's breach-of-contract claim due to vagueness (as to the scope, nature, duration and cost of the treatment in question); (4) Plaintiff's argument that "lack of consideration" is an affirmative defense that must be pled or waived is a misstatement of Fed. R.

---

[3] Plaintiff's opposition memorandum of law violates the Court's Local Rules of Practice in two regards: (1) it is 30 pages in length, exceeding the 25-page limit; and (2) it omits the required table of contents. N.D.N.Y. L.R. 7.1(a)(1). Plaintiff's counsel is respectfully reminded to comply with these local rules in the future.

Civ. P. 8(c), which merely requires the pleading of the affirmative defense of "failure of consideration"; (5) furthermore, Plaintiff has been on notice at all times that Defendant is denying the existence of a valid contract, and Defendant never argued (and the Court never decided) that Plaintiff's tort claims should be dismissed because he had a valid breach-of-contract claim); and (6) in any event, based on the current record, no rational fact-finder could conclude that Plaintiff gave consideration that was legally sufficient to support a valid contract, because (a) any decision he made to forego suing Defendant was not made in good faith (a fact that he admitted in Paragraph 39 of his "Revised First Amended Complaint"), (b) his decision to disclose his confidential healthcare records was not made until a year after he entered into the contract (and it is well settled that, in evaluating sufficiency of consideration for a contract, a court looks only to the time the contract was entered into), and (c) all of the providers who treated Plaintiff were either found by him or referred to him by other providers that he himself had found). (Dkt. No. 129, Attach. 2.)[4]

## B. Parties' Arguments on Plaintiff's Motion for Leave to File a Third Amended Complaint

Generally, in support of his motion for leave to file a Third Amended Complaint, Plaintiff asserts the following four arguments: (1) in his proposed Third Amended Complaint (which he calls his proposed "Second Amended Complaint"), Plaintiff seeks to reassert, in a correct form, his Third Cause of Action (claiming fraud in the inducement), Fourth Cause of Action (claiming intentional infliction of emotional distress), and Fifth Cause of Action (claiming breach of fiduciary duty), which had been dismissed by the Court in its Decision and

---

[4]     Defendant's reply memorandum of law violates the Court's Local Rules of Practice in that it exceeds the 10-page limit. N.D.N.Y. L.R. 7.1(b)(1). Again, defense counsel is respectfully reminded to comply with this local rule in the future.

Order of January 10, 2012, for failure to state a claim; (2) in addition, the proposed Third Amended Complaint seeks to amend the caption so as to assert a claim against "Robert J. Cunningham, as Bishop of the Roman Catholic Diocese of Syracuse, New York, a corporation sole"; (3) Plaintiff has not substantially or unjustifiably delayed in requesting the proposed amendments, which were necessitated by the fact that Plaintiff unearthed evidence giving rise to the amendments during the extensive discovery that conducted in this action between approximately April 2011 and January 2012; and (4) permitting the proposed amendments would not cause undue prejudice to Defendant.  (Dkt. No. 115, Attach. 1 [Schlather Affirm.].)

Generally, in response to Plaintiff's motion, Defendant asserts the following three arguments: (1) Plaintiff has unduly delayed in making this motion, because the deadline for amended pleadings expired on June 1, 2010, and the period for discovery ended on May 25, 2012; (2) Defendant is unduly prejudiced by Plaintiff's undue delay, because it took the time and incurred the expense of filing a motion for summary judgment before the motion for leave to amend was filed; and (3) in any event, Plaintiff's proposed amendments are futile, because (a) the underlying facts of this case, as revealed during discovery and alleged in the Fourth Cause of Action of the proposed Third Amended Complaint, do not state a claim for intentional infliction of emotional distress, which claim requires extreme and outrageous conduct (which claim Plaintiff previously voluntarily abandoned through his submission of a "Revised First Amended Complaint" on June 2, 2010), (b) Plaintiff's other tort claims (including a claim for fraud in the inducement) were previously rejected by this Court based on a lack of merit, not based on a defective pleading, and (c) Plaintiff has proffered no specific reason for the requested amendment of the caption, which could have been requested years ago.  (Dkt. No. 127, Attach. 1 [Def.'s Opp'n Mem. of Law].)

**III.    GOVERNING LEGAL STANDARDS**

**A.    Standard Governing Motions for Summary Judgment**

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

**B.    Standard Governing Motions for Leave to Amend a Pleading**

Motions for leave to amend a complaint are governed by Fed. R. Civ. P. 15, which states that leave to amend should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993).  Nevertheless, leave to amend a complaint is not automatic; and a court may deny a motion for leave to amend where there is an apparent or declared reason not to grant leave to amend, "such as [1] undue delay, bad faith or dilatory motive on the part of the movant, [2] repeated failure to cure deficiencies by amendments previously allowed, [3] undue prejudice to the opposing party by virtue of the allowance of the amendment, [4] futility of amendment, etc." *Foman*, 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 Hous.*, 608 F.2d 28, 42 (2d Cir. 1979).

With regard to the first factor described above (i.e., undue delay, bad faith or dilatory motive on the part of the movant), the Court notes that, where a motion is so belated as to violate a scheduling order, an additional requirement of good cause is imposed on the movant.  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) ("[D]espite the lenient

standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."); Fed. R. Civ. P. 16(b)(4), (f)(C) ("A schedule may be modified only for good cause and with the judge's consent. . . . On motion or its own, the court may issue any just orders . . . if a party or its attorney . . . fails to obey a scheduling or other pretrial order.").

Finally, in this District, a motion for leave to amend a pleading must (1) attach an unsigned copy of the proposed amended pleading, and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means. N.D.N.Y. L.R. 7.1(a)(4). Failure to comply with this rule is a ground on which to deny a motion to amend. *See, e.g., Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y.2009) (Lowe, M.J., adopted by Suddaby, J.).

## IV. STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts have been asserted and supported by Defendant in its Rule 7.1 Statement and either expressly admitted by Plaintiff or denied by Plaintiff without a supporting record citation in its Rule 7.1 Response. (*Compare* Dkt. No. 112, Attach. 13 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 123 [Plf.'s Rule 7.1 Response].) Docket citations given below are to the screen number shown on the docket, not the page number listed on the document.

1. Plaintiff credibly alleges that, in the mid-1960s, he was sexually abused by Father Thomas Neary, a Roman Catholic priest assigned to work in the Diocese; Plaintiff had no memory of the incident until the summer of 2001. (*Compare* Dkt. No. 112, Attach. 13, at ¶ 1 [Def.'s Rule 7.1 Statement, asserting and supporting fact] *with* Dkt. No. 123, at ¶ 1 [Plf.'s Rule 7.1 Response, partially denying fact but citing record evidence that actually supports fact].)

2. In July or August of 2001, within a month or so after returning home from a weekend-long religious retreat in June of 2001, Plaintiff recalled a childhood incident of sexual abuse by a priest, although he could not recall the name of the priest. (Dkt. No. 119, Attach. 1, at 16-23 [attaching pages "86" through "93" of Brennan Dep.]; Dkt. No. 112, Attach. 6, at 94 [attaching page "94" of Brennan Dep.].)

3. During a morning in the early part of 2002, he telephoned a priest in Florida, Father Thomas Madden, whom he told "roughly what was going on" and "where it happened"; that afternoon, he met with Father Madden in his office, where he sobbed. (Dkt. No. 112, Attach. 6, at 119-21 [attaching pages "119" through "121" of Brennan Dep.].)

4. Between the time of the morning telephone call and the time of the afternoon meeting, Father Madden contacted Bishop Thomas Costello at the Diocese and obtained from him a list of four priests who had been assigned to St. Mary's Church in Skaneateles, New York, in the time period during which Plaintiff recalled having been abused. (Dkt. No. 112, Attach. 6, at 120-23 [attaching pages "120" through "123" of Brennan Dep.].)

5. From the list, Plaintiff identified Father Thomas Neary as his abuser and contacted Bishop Costello by telephone, at the Bishop's invitation, to discuss the situation. Bishop Costello never met Plaintiff face-to-face prior to the lawsuit and spoke to him on the telephone only twice, both in early 2002.

6. Bishop Costello apologized to Plaintiff for any abuse he might have suffered and asked him if he was getting any care, to which Plaintiff responded that he was still looking for someone in his geographic proximity and that he did not have money for treatment.

7. Bishop Costello told Plaintiff, "Get whatever help you feel you need and the Diocese will pay for it."

8. Subsequently, on or about March 16, 2002, Bishop Costello wrote a memo stating, inter alia, that Costello had indicated to Plaintiff by telephone that Defendant would reimburse Plaintiff for counseling assistance "for a while."  (Dkt. No. 119, Attach. 6, at 41 [Ex. N to Schlather Affid.]; Dkt. No. 112, Attach. 8, at 4 [attaching page "101" of Costello Dep.].)

9. In May of 2002, Plaintiff had a second conversation with Bishop Costello; however, during that conversation (which was the only other conversation Plaintiff had with Bishop Costello), there was no discussion with respect to his treatment or reimbursement for treatment.

10. In approximately April of 2002, Plaintiff found Dr. Mary Lutzo, a licensed mental health counselor and psychotherapist, on the internet and began receiving treatment from her in Petersburg, Florida.  (Dkt. No. 112, Attach. 7, at 17-18 [pages "139" through "141" of Brennan Dep.]; Dkt. No. 126, at 2 [attaching Paragraphs 3 and 5 of Lutzo Affid.].)  A course of conduct developed through which Dr. Lutzo periodically submitted to the Diocense treatment reports and invoices, which the Diocese paid.  (*See, e.g.,* Dkt. No. 126, at 2-19 [attaching Paragraphs 5 through 81 of Lutzo Affid.]; Dkt. No. 114, Attach. 3, at 142-43, 198, 202 [pages "141," "142," "197," and "202" of Brennan Dep.]; Dkt. No. 123, at ¶ 14 [Plf.'s Rule 7.1 Response, admitting fact].)  That treatment continued on an irregular and interrupted basis from approximately April 2002 through November of 2008, by which time the Diocese had expended more than $36,000 on Plaintiff's treatment.  (*See, e.g.,* Dkt. No. 126, at 2-19 [attaching Paragraphs 5 through 81 of Lutzo Affid.]; Dkt. No. 114, Attach. 3, at 181-82 [pages "180" and "181" of Brennan Dep.]; Dkt. No. 120, at ¶ 14 [Brennan Affid.].)

11. The Diocese originally agreed to pay for a specific number of sessions with Dr. Lutzo, then extended the number of sessions based on a report from Dr. Lutzo indicating that she believed further treatment was necessary.  Dr. Lutzo continued to request additional sessions, which were approved for payment by the Diocese, through November of 2008.

14

12.  From April of 2002 to November of 2008, Plaintiff continued to see counselors, therapists and medical providers of his choosing (with the exception of therapists and providers in connection with intensive therapy in a six-week residential program in June or July of 2007); and the Diocese continued to approve and pay Plaintiff's bills.  (Dkt. No. 126, at ¶¶ 71, 78 [Lutzo Affid.].)  During that six-year period, the Diocese paid for various types of outpatient care and treatment for Plaintiff, including individual therapy sessions, counseling sessions, and group therapy sessions.  (*Compare* Dkt. No. 112, Attach. 13, at ¶ 16 [Def.'s Rule 7.1 Statement, asserting and supporting fact] *with* Dkt. No. 123, at ¶ 16 [Plf.'s Rule 7.1 Response, not expressly denying asserted fact].)

13. During that six-year period, Plaintiff was treated by Dr. Lutzo approximately 250 times on an intermittent basis; Dr. Lutzo submitted quarterly invoices to the Diocese (for each quarter in which she treated Plaintiff); and the Diocese ultimately paid those invoices.  (Dkt. No. 114, Attach. 3, at 181-82 [attaching pages "180" and "181" of Brennan Dep.]; Dkt. No. 126, at 2-19 [attaching Paragraphs 5 through 81 of Lutzo Affid.]; Dkt. No. 120, at ¶ 14 [Brennan Affid.].)

14. On or about June 26, 2007, the Diocese sent Plaintiff a letter refusing to approve a charge, in the sum of approximately $60,000, for a six-week residential program at the Life Healing Center of Santa Fe, New Mexico.  (Dkt. No. 112, Attach. 7, at 82-83 [attaching pages "205" and "206" of Brennan Dep.]; Dkt. No. 112, Attach. 2, at ¶¶ 78, 87 [Plf.'s "Revised First Amended Complaint"].)

15. To the best of Bishop Costello's knowledge, this was the first time a victim of clergy sexual abuse had ever requested the Diocese to pay for an extended residential program.

16. Following the refusal of the Diocese to reimburse the $60,000 cost of the Life Healing Center, Plaintiff hired a lawyer, Thomas McGowan, and started drafting a Summons and Complaint against the Diocese, which he filed on October 1, 2007.

17. In November of 2009, Plaintiff participated in a four-week stay at the Life Healing Center at his own expense. While he believed that overall the program was "very beneficial," he felt he did not get the "full benefit" of the program because he could not afford to pay for a fifth week of the program, as well as for any post-session transition. (Dkt. No. 114, Attach. 3, at 226-233 [attaching pages "225" through "232" of Brennan Dep.].)

18. In June of 2002, the United States Conference of Catholic Bishops established the Charter for the Protection of Children and Young People.

19. In October of 2003, the Diocese put into effect a Child and Youth Protection Policy, which provides, inter alia, as follows:

> 7.2    Counseling Assistance for Victims and Their Families
>
> Pastoral care to persons who were minors when harmed by sexual abuse and their families shall be offered. The Diocesan Assistance Coordinator will facilitate assessment, counseling and therapeutic interventions by accredited and competent counselors, as mutually agreed upon by the individual receiving pastoral care or the victim's parent/guardian in the case of a minor child and the Diocese.
>
> The reasonable cost of assessment and counseling for the victim and, in certain cases family members, will be assumed by the Diocese provided that:
>
> a.    A qualified professional counselor makes an initial assessment which is acceptable to the diocese.
>
> b.    The assessment contains recommendations for length of counseling and treatment goals.

      c.     The recommendations are to be in accordance with the standard of care practiced in the community.

      d.     Treatment plans and goals are routinely monitored by a qualified professional counselor and reviewed no less than every six months.

    7.3    Additional Forms of Pastoral Care

Appropriate pastoral care also may include medical evaluation and treatment, spiritual guidance, identification of support groups and other social services and resources for healing depending upon the circumstances and particular needs of the victim, which shall be determined and mutually agreed upon by the Diocese and the victim or the victim's parent/guardian in the case of a minor.

20. The Diocese had received a letter from Plaintiff dated February 11, 2003, requesting that he be paid $750,000 as restitution for the abuse he had suffered at the hands of Father Neary.

21. Plaintiff filed this action on October 10, 2007. Plaintiff's "Revised First Amended Complaint" asserted five causes of action: (1) for a judgment declaring that Plaintiff is entitled, by virtue of an agreement with the Diocese, to be compensated for unspecified expenses relative to his continuing treatment; (2) seeking damages for the alleged breach by the Diocese of an oral agreement to pay for Plaintiffs treatment; (3) alleging fraud in the inducement; (4) alleging that the Diocese negligently failed to discharge its duty to provide Plaintiff with appropriate and necessary therapeutic and psychological care; and (5) alleging that the Diocese breached a fiduciary duty to Plaintiff.

22. The Third, Fourth and Fifth Causes of Action asserted in the "Revised First Amended Complaint" were dismissed by Order of this Court dated January 10, 2012.

23. According to Plaintiff's interrogatory responses and "Revised First Amended Complaint," the agreement that Plaintiff claims he had with the Diocese was based on his telephone conversation with Bishop Costello in January of 2002. (Dkt. No. 112, Attach. 5, at 23-

25 [Plf.'s Response to Def.'s Interrogatory No. 15.a.]; Dkt. No. 112, Attach. 2, at ¶¶ 14-15 [Plf.'s "Revised First Amended Complaint"].)  According to Plaintiff's Rule 7.1 Response, the agreement that Plaintiff claims that he had with the Diocese–which was the produced of repeated assurances–was based also on (1) a written representation by the Diocese on February 21, 2002, that it would offer credible claimants with pastoral counsel and psychological assistance, and (2) a written representation by Bishop Costello on March 16, 2012, that the Diocese "would pick up the cost of this intervention for a while."  (Dkt. No. 123, at ¶ 33 [Plf.'s Rule 7.1 Response, asserting and supporting fact].)

24. In his "Revised First Amended Complaint," Plaintiff does not allege that, before he entered into an agreement with the Diocese, the Diocese asked him to give anything up.  (*See generally* Dkt. No. 112, Attach. 2 [Plf.'s "Revised First Amended Complaint"].)

25. According to Plaintiff's "Revised First Amended Complaint," the first time that the Diocese requested to see any of Plaintiff's treatment records was on March 17, 2003.  (*See generally* Dkt. No. 112, Attach. 2, at ¶¶ 15, 30-31, 35 [Plf.'s "Revised First Amended Complaint"].)

## V.     ANALYSIS

### A.     Defendant's Motion for Summary Judgment

#### 1.     Plaintiff's First Cause of Action

In support of its request for summary judgment on Plaintiff's First Cause of Action (seeking a declaratory judgment), Defendant argues, as a threshold matter, that, to the extent Plaintiff's First Cause of Action is based on a tort theory of liability, that cause of action is barred by the law-of-the-case doctrine, given that, in its Decision and Order of January 10, 2012, the Court dismissed  all of Plaintiff's tort claims.  *See, supra,* Part II.A. of this Decision and

Order.  In his opposition memorandum of law, Plaintiff does not oppose that threshold argument. *Id*.  In this District, the failure to oppose a legal argument in response to a motion lightens the movant's burden with respect to that legal argument such that, in order to succeed on that argument, the movant need show only that the argument possesses facial merit.[5]  Here, the Court finds that, at the very least, Defendant's threshold legal argument possesses facial merit, for the reasons stated therein.  *See, supra,* Part II.A. of this Decision and Order.  As a result, to the extent Plaintiff's First Cause of Action is based on a tort theory of liability, that cause of action is dismissed.

Defendant further argues that, to the extent Plaintiff's First Cause of Action (seeking a declaratory judgment) is based on a breach-of-contract theory of liability, the success of that cause of action is premised on the success of Plaintiff's Second Cause of Action (for breach of contract), which is barred based on (1) a lack of valid consideration and/or (2) a lack of essential and material terms of the contract.  *See, supra,* Part II.A. of this Decision and Order.  In response, Plaintiff appears to agree with the first part of Defendant's argument (i.e., that the success of Plaintiff's First Cause of Action is premised on the success of his Second Cause of Action); however, Plaintiff disagrees that his Second Cause of Action is barred by (1) a lack of valid consideration and/or (2) a lack of essential and material terms of the contract.  *Id*.  For the reasons set forth below, the Court must reject this part of Defendant's motion for summary judgment.

---

[5]     *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting . . . of the motion . . . , unless good cause be shown."); *Zuk v. Onondaga Cnty.*, 09-CV-0272, 2011 WL 4344043, at *4 & nn.1-3 (N.D.N.Y. Sept. 14, 2011) (Suddaby, J.) (reciting point of law and citing cases).

### 2.     Plaintiff's Second Cause of Action

### a.     Insufficient Consideration

After carefully considering the matter, the Court must reject Defendant's argument that, based on the current record, no rational fact-finder could conclude that valid consideration, sufficient to support the contractual obligation of Defendant, was created by any of the three acts cited by Plaintiff.

As an initial matter, the Court accepts Plaintiff's threshold argument that Defendant has failed to plead, in its relevant Answer, the affirmative defense of lack of consideration. (Dkt. No. 74.) The Court reaches this conclusion for the reasons stated in Plaintiff's opposition memorandum of law. *See, supra,* Part II.A. of this Decision and Order. In addition to the case cited by Plaintiff (*Jaufman v. Levine*, 06-CV-1295, 2007 WL 2891987, at *12 [N.D.N.Y. Sept. 28, 2007] [Mordue, C.J.]), the Court relies on four other cases.[6] The Court would add only that, regardless of the material legal distinction that may or may not exist between the term "lack of consideration" and the term "failure of consideration" (the latter of which is listed in Fed. R. Civ. P. 8[c][1]), Fed. R. Civ. P. 8(c)(1) provides merely a *non-exhaustiv*e list of affirmative defenses,

---

[6]     *See Super 8 Worldwide, Inc. v. Am. Lodging*, 08-CV-4514, 2011 WL 248447, at *5 (N.D. Ill. Jan. 25, 2011) ("That a contract lacked consideration or was the product of fraud or duress are affirmative defenses that must be pled in a responsive pleading. Fed. R. Civ. Proc. 8(c)(1)."); *Stoneware, Inc. v. TecServ, Inc.*, 07-CV-1188, 2009 WL 5175193, at *8, n.12 (S.D. Ind. Dec. 21, 2009) ("TecServ did not assert lack of consideration as an affirmative defense in its September 24, 2008 Answer. Under Federal Rule of Civil Procedure 8(c), . . . [i]f a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived."); *Langsfeld v. Wynne*, 08-CV-0225, 2009 WL 383395, at *5 (N.D. Ga. Feb. 12, 2009) ("[U]nder Federal Rule of Civil Procedure 8(c)(1), a defendant must specifically assert affirmative defenses such as lack of consideration . . . ."); *Hanover Ins. Co. v. Cameron Country Mut. Ins. Co.*, 730 F. Supp. 998, 1000 (E.D. Mo. 1990) ("Defendant did not plead lack of consideration as an affirmative defense and therefore the issue is deemed waived [pursuant to Fed. R. Civ. P. 8(c)].").

introducing them with the word "including."[7]  Simply stated, it is difficult for the Court to treat

lack of consideration as something other than an affirmative defense.  *See, e.g., Thomas H. Lee*

*Equity Fund V, L.P. v. Bennett,* 05-CV-9608, 2007 WL 950133, at *2 (S.D.N.Y. March 28,

2007) ("As a matter of pleading, however, the prevailing rule is that consideration need not be

pled in the complaint, and that lack of consideration is best treated as an affirmative defense.").

Similarly, the Court accepts Plaintiff's further argument that permitting Defendant to

raise the affirmative defense at the summary judgment stage would cause undue prejudice to

Plaintiff.  The Court reaches this conclusion for the reasons stated in Plaintiff's opposition

memorandum of law.  *See, supra,* Part II.A. of this Decision and Order.  In addition to the

rationale offered by Plaintiff, the Court offers the following rationale.

The Court acknowledges that, in its Answer, Defendant denied Plaintiff's allegation that

"for good and valuable consideration, and by reason of the foregoing, the parties entered into an

agreement whereby the Diocese would pay for the reasonable and necessary therapeutic and

psychological expenses at issue herein."  (*Compare* Dkt. No. 74, at ¶ 111 [Def.'s Answer] *with*

Dkt. No. 73, at  ¶ 111 [Plf.'s "First Amended Complaint"].)  However, this denial–which does

not identify whether the denial arises from the lack of "good and valuable consideration," the

lack of a reasonable relationship to "the foregoing," or the lack of an agreement on the terms

specified–is not sufficient to state the affirmative defense of lack of consideration.  (*Id.*)  Rather,

to give Plaintiff fair notice under the circumstances, Defendant should have pled this affirmative

---

[7]        *See, e.g., Jones v. Bock,* 549 U.S. 199, 212 (2007) (characterizing list in question
as "nonexhaustive"); *Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 807 (8th Cir. 2013)
(characterizing list in question as "non-exhaustive"); *Charleswell v. Chase Manhattan Bank,
N.A.*, 01-CV-0119, 2009 WL 4981730, at *5 (D. V.I. Dec. 9, 2009) ("This Court agrees that Rule
8(c) is not exhaustive.").

defense in a separate paragraph and labeled it an affirmative defense.[8]

Moreover, the Court acknowledges that the question of consideration was asked by Defendant in Interrogatory No. 15.d., and responded to by Plaintiff.  (Dkt. No. 112, Attach. 5, at 23-25 [Plf.'s Response to Def.'s Interrogatory No. 15.d.].)  However, Plaintiff gave that response on October 4, 2010.  (Dkt. No. 112, Attach. 5, at 43.)  Despite that fact, Defendant did not raise the defense (through its motion for summary judgment) until more than one year nine months later, on July 26, 2012.  (Dkt. No. 112.)  When Plaintiff gave that response (on October 4, 2010), the deadline for motions to amend pleadings had only recently expired, approximately four months before.  (Dkt. No. 68, at 2 [setting deadline as June 1, 2010].)  Defendant could have requested an extension of that deadline, upon a showing of good cause.  *See, supra,* Part III.B. of this Decision and Order.  However, it did not do so.  (*See generally* Docket Sheet.)  Indeed, in its current motion, Defendant does not attempt to show good cause.  (*See generally* Dkt. No. 112, Attach. 14 [Def.'s Memo. of Law]; Dkt. No. 129, Attach. 2 [Def.'s Reply Memo. of Law].)  The Court notes that one of the reasons that it denies Plaintiff's motion for leave to amend his second amended complaint is *his* failure to show good cause.  *See, infra,* Part V.B. of this Decision and Order.

Furthermore, the Court acknowledges that (1) most of the relevant discovery on the subject of consideration appears to be in the possession of Plaintiff (as evidenced by his affidavit

---

[8]  *See First Horizon Home Loan Corp. v. Phillips*, 07-CV-0250, 2008 WL 906698, at *5 (D. Ariz. March 31, 2008) ("[T]he Court grants Plaintiff's motion for a more definite statement pursuant to FRCP 12(e), and directs . . . Defendants . . . to amend their answers to include a more definite statement of their affirmative defense(s) by pleading their affirmative defenses in separate paragraphs and labeling each as an affirmative defense."); *cf. Pandora Jewelers 1995, Inc. v. Pandora Jewelry*, 09-CV-61490, 2010 WL 5393265, at *2 (S.D. Fla. Dec. 21, 2010) ("I believe the better practice is to properly label denials and affirmative defenses, and to keep these two defenses separate. For these reasons, the Plaintiff's motion to strike the Defendants' first affirmative defense is granted.").

testimony and interrogatory responses adduced on the subject), based upon the three types of consideration he asserts, each of which has to do with forbearance or waiver (Dkt. No. 124, at 18-24 [Plf.'s Opp'n Memo. of Law]), and (2) Plaintiff did not specifically identify what other discovery he would have conducted, including what specific questions his counsel would have asked deponents such as Bishop Costello, Nancy Wright, Theresa Secreti, Nuala Collins, Father Clifford Auth, or Danielle Cummings (Dkt. No. 124, at 11 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 119, at ¶ 14 [Schlater Affirm.].) However, it is not difficult for to the Court to imagine that Plaintiff's counsel would have asked the deponents questions such as (1) whether the agreement that Plaintiff would disclose to Defendant confidential healthcare records at some point in the future was understood by the parties in early 2002, and (2) whether in early 2002 Defendant imposed on Plaintiff a condition that Defendant had to approve the provider from whom Plaintiff could received treatment. Permitting Plaintiff's counsel to reopen the depositions in question and ask those questions now would unreasonably delay a trial in this action, which is already approximately five years nine months old, with a discovery deadline that expired more than a year go (on May 25, 2012). (*See* Docket Entry dated Jan. 12, 2012.)

For all of these reasons, the Court must reject Defendant's argument that Plaintiff's Second Cause of Action must be dismissed for lack of consideration.

### b.  Lack of Essential Terms

After carefully considering the matter, the Court must reject Defendant's argument that, based on the current record, no rational fact-finder could conclude that there was a meeting of the minds between the parties with respect to the essential and material terms of the contract (i.e., the scope, extent and duration of the treatment for which Defendant allegedly contracted to pay) so as to create an enforceable contract. The Court reaches this conclusion for the reasons

stated in Plaintiff's opposition memorandum of law. *See, supra,* Part II.A. of this Decision and Order. The Court would add only two brief points.

First, based on the current record, a genuine dispute of material fact exists regarding whether, in early 2002, the parties agreed that the duration of the treatments at issue would be only "for a while" or until Plaintiff stopped needing those treatments. In reaching this conclusion, the Court relies on, *inter alia*, the affidavit and deposition testimony of Plaintiff. (*See, e.g.,* Dkt. No. 120, at ¶ 10 [Plf.'s Affid.]; Dkt. No. 120, at ¶ 10 [Plf.'s Affid.]; Dkt. No. 112, Attach. 7, at 14-15, 77-28 [attaching pages "137," "138," "200," and "201" of Brennan Dep.].)

Second, based on the current record, a genuine dispute of material fact exists regarding whether, in early 2002, the parties agreed that the scope and extent of the treatments at issue would be limited to individual out-patient counseling or whatever type of counseling Plaintiff needed, including group counseling in a residential treatment program. In reaching this conclusion, the Court relies on, *inter alia*, the following: (1) the affidavit and deposition testimony of Plaintiff; (2) the deposition testimony of Theresa Secreti; and (3) the deposition testimony of Danielle Cummings. (*See, e.g.,* Dkt. No. 120, at ¶ 10 [Plf.'s Affid.]; Dkt. No. 112, Attach. 7, at 14-15, 77-28 [attaching pages "137," "138," "200," and "201" of Brennan Dep.]; Dkt. No. 119, Attach. 4, at 9-11, 22-24, 43-44 [attaching pages "126," "127," "128," "216," "217," "218," "320," and "321" of Secreti Dep.]; Dkt. No. 119, Part 5, at 2 [attaching page "116" of Cummings Dep.].)

For all of these reasons, the Court must reject Defendant's argument that Plaintiff's Second Cause of Action must be dismissed for lack of essential terms.

**B.      Plaintiff's Motion for Leave to File a Third Amended Complaint**

After carefully considering the matter, the Court denies this motion for each of the reasons offered by Defendant in its opposition memorandum of law. *See, supra,* Part III.B. of this Decision and Order. The Court would add only two brief points.

First, Plaintiff filed his motion to amend on August 10, 2012–more than two years and two months after the expiration of the deadline for motions to amend. (Dkt. No. 68, at 2 [setting deadline as June 1, 2010].) As a result, Plaintiff must show good cause for his motion. *See, supra,* Part III.B. of this Decision and Order. Plaintiff does not even attempt to show such good cause. (*See generally* Dkt. No. 115, Attach. 1 [Schlather Affirm., not even arguing good cause].) This omission is conspicuous given that Plaintiff has already had *three* opportunities to submit a proposed amended pleading. (*See* Dkt. No. 33, Attach. 3; Dkt. No. 53, Attach. 2-3; Dkt. No. 73.) As a result, Plaintiff's motion may be, and is, denied on this independent ground.

Second, attached to Plaintiff's motion is a copy of his proposed Third Amended Complaint. (Dkt. No. 115, Attach. 3.) The problem is that the proposed amended pleading does not identify the amendments he is proposing through the red-lined process or another equivalent means, as it must under the Court's Local Rules of Practice. *See, supra,* Part III.B. of this Decision and Order.[9] Again, a failure to comply with this rule is a ground on which to deny a motion to amend. *See, supra,* Part III.B. of this Decision and Order. As a result, Plaintiff's motion may be, and is, denied on this alternative ground.

---

[9]      The Court notes that this failure has caused some confusion in this case, regarding what new claims Plaintiff is proposing. (*See* Dkt. No. 127, Attach. 1 [Def.'s Opp'n Mem. of Law, arguing that Plaintiff is attempting to reassert claims of intentional infliction of emotional distress and fraud in the inducement].)

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 112) is

**GRANTED in part** and **DENIED in part**, as discussed above in Part V.A. of this Decision and

Order; and it is further

**ORDERED** that, to the extent Plaintiff's First Cause of Action is based on a tort theory

of liability, that cause of action is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's motion for leave to file a Third Amended Complaint (Dkt.

No. 115) is **DENIED**; and it is further

**ORDERED** that counsel are directed to appear on **SEPTEMBER 25, 2013** at 1:30 p.m.

in chambers for a pretrial conference, at which counsel are directed to appear with settlement

authority, and in the event that the case does not settle, trial will be scheduled at that time.

Plaintiff is further directed to forward a written settlement demand to defendants no later than

**AUGUST 30, 2013**, and the parties are directed to engage in meaningful settlement negotiations

prior to the 9/25/13 conference.

Dated: August 14, 2013
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge